**In re Robert J. GARTSIDE and Richard C. Norton**

No. 99–1241.

United States Court of Appeals, Federal Circuit.

Feb. 15, 2000

ting by designation.

Alan B. Clement, Heidman, Gibson & Costigan, of New York, New York, argued for appellants.

Mark Nagumo, Associate Solicitor, Office of the Solicitor, of Arlington, Virginia, argued for appellee. With him on the brief were Albin F. Drost, Acting Solicitor; John M. Whealan, Acting Deputy Solicitor; and Nancy Moncys Isacson, Associate Solicitor.

Before LOURIE, CLEVENGER, and RADER, Circuit Judges.

LOURIE, Circuit Judge.

Robert J. Gartside and Richard C. Norton (collectively "Gartside") appeal from the final decision of the Board of Patent Appeals and Interferences holding that claims 34, 35, and 37–47 of application Ser. No. 07/798,627 are unpatentable as obvious under 35 U.S.C. § 103. *See Forgac v. Gartside,* Paper No. 72 (BPAI May 21, 1998). Because the Board's factual findings relating to its obviousness analysis are supported by substantial evidence, and because the Board did not err in concluding that the claims were unpatentable as obvious as a matter of law, we affirm.

## BACKGROUND

A. *The Invention*

Gartside's application is directed to "cracking" processes, *i.e.,* processes that generate low molecular weight, purified hydrocarbons of desired molecular composition by breaking down impure, high molecular weight hydrocarbon feed oil. Cracking is accomplished by reacting impure feed oil with "solids," particulate matter that induces the breakdown of feed oil by either a thermal or catalytic reaction mechanism. *See* '627 application, J.A. at 63. The claims at issue are all directed to catalytic cracking processes. Independent claim 47 has been argued to us as being "representative" of claims 34, 35, 37–40, and 42–44 and reads as follows:

47. A catalytic process comprising the steps of:

catalytically cracking hydrocarbon feed oil in a reactor of a catalytic cracking unit in the presence of a cracking catalyst at a temperature ranging from 1100 to 1500F to produce a catalytically cracked effluent stream of upgraded oil containing catalyst;

substantially separating said catalyst from said upgraded oil in a separator and a cyclone; and

quenching said upgraded oil downstream of said separator upstream of said cyclone with a quenching oil.

*Id.* at 51 (paragraphing added). Independent claim 41 is similarly "representative" of dependent claims 45 and 46 and reads as follows:

41. A catalytic process, comprising the steps of:

(a) delivering hot particulate catalytic cracking solids to a catalytic cracking reactor;

(b) delivering a hydrocarbon feed to said reactors;

(c) cracking said hydrocarbon feed in said reactor at a temperature of from 1100 to 1500F to produce a cracked product;

(d) separating said catalytic solids from the cracked product;

(e) quenching said cracked product;

wherein the total residence time from step (a) through step (e) ranges from 0.1 to 0.6 seconds.

*Id.* at 49 (paragraphing added).

B. *The Interference Proceeding*

Gartside copied claims from Forgac's U.S. Patent 5,043,058, entitled "Quenching Downstream of an External Vapor Catalyst Separator," into the '627 application, attempting to provoke an interference.[1] On February 4, 1994, the Administrative Patent Judge ("APJ") declared the inter-

---

1. 37 C.F.R. § 1.601(i) defines an "interference" in relevant part as follows:

An interference is a proceeding instituted in the Patent and Trademark Office before the Board to determine any question of patent-

ference between Gartside's application and Forgac's patent. *See* Paper No. 17 at 1. The APJ designated Gartside as the "senior party" and Forgac as the "junior party" in the interference, because Gartside's application was accorded an effective filing date prior to March 26, 1990, the filing date of the application that issued as Forgac's patent. *See id.* at 2–3. The APJ also determined that one count encompassed all of the interfering subject matter,[2] *i.e.,* claims 34–47 of the application and claims 1, 2, and 13 of the patent, and that that count corresponded exactly to claim 47 of the application. *See id.* at 3–4.

On September 12, 1995, the APJ issued an order addressing the parties' motions filed during the preliminary motion period. *See* Paper No. 41 at 1–2. Of the parties' eight motions, only two are relevant here: Gartside's motion to designate certain claims as not corresponding to the count, and Forgac's motion for judgment that all of Gartside's claims were unpatentable under 35 U.S.C. § 103. The APJ denied Gartside's motion to designate claims 36, 41, 45, and 46 as not corresponding to the count, concluding that Gartside had failed to show that those claims were patentably distinct from the other claims corresponding to the count. *See generally id.* at 7–11. The APJ granted in part Forgac's motion for judgment that Gartside's claims were invalid under § 103. *See id.* at 11. The APJ first observed that while Forgac's motion was directed to all of Gartside's claims corresponding to the count (claims 34–47), Forgac only performed a § 103

analysis as to claim 47. *See id.* at 11–12. The APJ apparently concluded that this analysis was acceptable with regard to the claims for which Gartside had not presented specific patentability arguments, namely claims 34, 35, 37–40, and 42–44, and indicated that those claims would thus stand or fall based on the arguments made on behalf of claim 47. *See id.* at 12. Since Gartside argued separately the patentability of claims 36, 41, 45, and 46, the APJ indicated that those claims would be considered apart from claim 47. *See id.*

Analyzing the claims that stood or fell with claim 47 first, the APJ held that those claims were unpatentable as obvious under § 103. *See id.* at 12. The APJ based his conclusion on Gartside's U.S. Patent 4,552,645, which teaches a process of thermally cracking feed oil that is nearly identical to the process claimed in claim 47, either alone or in combination with Gartside's U.S. Patent 4,288,235, which discloses apparatus that may be used for both thermal and catalytic processes employing low residence times and quenching to prevent undesired cracking. *See id.* The APJ found that the motivation to combine the thermal cracking teachings of the '645 patent with a catalytic cracking process as disclosed in the '235 patent arose from the nature of the problem to be solved, *viz.,* undesired cracking due to the presence of thermal or catalytic solids. *See id.* at 15. Thus, the APJ concluded that claim 47, as well as claims 34, 35, 37–40, and 42–44, were unpatentable under § 103. *See id.* at 12.

ability and priority of invention between two or more parties claiming the same patentable invention.... An interference may be declared between one or more pending applications and one or more unexpired patents naming different inventors when, in the opinion of an examiner, any application and any unexpired patent contain claims for the same patentable invention.
37 C.F.R. § 1.601(i) (1999).

2. 37 C.F.R. § 1.601(f) defines "count" as follows:

A count defines the interfering subject matter between two or more applications or between one or more applications and one or more patents. At the time the interference is initially declared, a count should be broad enough to encompass all of the claims that are patentable over the prior art and designated to correspond to the count.
37 C.F.R. § 1.601(f) (1999).

Having previously concluded that claims 36, 41, 45, and 46 did not stand or fall with claim 47, the APJ proceeded to analyze those claims as if Forgac had not placed their patentability at issue. The APJ held, *sua sponte*, that claims 36, 41, 45, and 46 were unpatentable under § 103, based on the '645 patent in view of U.S. Patent 4,419,221 (Castagnos), or on those two patents in view of the '235 patent, incorporating his reasoning with respect to claims 34, 35, 37–40, 42–44, and 47. *See id.* at 18–19. As noted above, essentially all of the limitations of claims 34, 35, 37–40, 42–44, and 47 were found in the combination of the '645 patent with the '235 patent. Since claims 36, 41, 45, and 46 each contain all of those limitations, as well as an additional kinetic residence time limitation, the APJ needed to add one additional reference to complete the combination. Accordingly, the APJ added Castagnos to the '645 and '235 patent combination, as Castagnos discloses the precise kinetic residence time recited in claims 36, 41, 45, and 46. *See id.* at 19–20. The APJ again found that the motivation to combine the teachings of the patents arose from the nature of the problem to be solved, *i.e.*, optimizing yields by avoiding undesired cracking. *See id.* at 20.[3]

Gartside requested reconsideration of the denial of his motion to redesignate claims 36, 41, 45, and 46 as not corresponding to the count, *see* Paper No. 45, and the granting in part of Forgac's motion to hold Gartside's claims unpatentable under § 103, *see* Paper No. 43. On reconsideration, the APJ denied both of these requests. *See* Paper No. 49. As for the *sua sponte* holdings of unpatentability, Forgac

and Gartside each filed timely responses, neither of which persuaded the examiner to depart from his earlier holdings, *see* Paper No. 50 at 15.[4] The APJ then ordered the parties to show cause why judgment should not be entered against them with respect to the patentability of all the claims corresponding to the count. *See id.* In response, Forgac and Gartside each requested a final hearing before the Board. *See* Paper Nos. 51 and 54.

On May 20, 1996, Forgac withdrew his request for a final hearing and authorized the APJ to cancel claims 1, 2, and 13 from the '058 patent. *See* Paper No. 63 at 1–2. Despite Forgac's withdrawal from the interference, the APJ held that the interference should proceed based on our decision in *Perkins v. Kwon*, 886 F.2d 325, 12 USPQ2d 1308 (Fed.Cir.1989), as the issues surrounding the patentability of Gartside's claims had been fairly placed at issue and fully developed during the interference, and they therefore should be resolved for the sake of the public interest. *See* Paper No. 64 at 3–5. Gartside requested reconsideration of this order and asked that his application be remanded to the primary examiner for further prosecution. *See* Paper No. 65 at 1. The APJ dismissed both requests, *see* Paper No. 66, and a final hearing was held on May 21, 1998.

The Board first held that the APJ properly concluded that the Board retained jurisdiction over the patentability issues raised in the interference. See *Gartside*, Paper No. 72 at 9. The Board reasoned that under our decision in *Schulze v. Green*, 136 F.3d 786, 45 USPQ2d 1770 (Fed.Cir.1998), the Board should .decide

---

3. Although not appealed here, the APJ also concluded that claims 1, 2, and 13 of Forgac's '058 patent were all unpatentable under § 103 based on the '645 patent and U.S. Patent 4,764,268, or over those two references in combination with the '235 patent. See id. at 21.

4. The APJ noted that in his response, Gartside had not contested the APJ's sua sponte hold-

ing that claim 36 was unpatentable (Paper No. 47), *see* Paper No. 50 at 14, and the APJ thus rendered judgment accordingly. Likewise, the Board did not address this claim in its final decision, *see* Paper No. 72 at 10 n. 10, and Gartside does not argue the patentability of claim 36 on appeal.

the patentability issues despite Forgac's withdrawal, as those issues were fairly raised and fully developed in the course of the interference. *See id.* at 7–9. The Board also noted that Gartside was not procedurally disadvantaged by the Board's decision to retain jurisdiction rather than remand to the examiner. *See id.* at 6–7.

Turning to the merits, the Board concluded that the APJ did not abuse his discretion[5] in holding that claims 34, 35, 37–40, 42–44 and 47 of the '627 application were unpatentable under § 103. *See id.* at 19. The Board agreed with the APJ that those claims would have been obvious based on the '645 patent alone or in combination with the '235 patent. *See id.* at 19. The Board also agreed with the APJ that the motivation to combine those references arose from the nature of the problem to be solved, *viz.,* minimizing undesired cracking. *See id.* at 15.

As for claims 41, 45, and 46, the Board first held that the APJ did not abuse his discretion in denying Gartside's motion to redesignate those claims as not corresponding to the count, reasoning that Gartside had failed to show that those claims were patentably distinct from the other claims corresponding to the count. *See id.* at 21–22, 27. The Board further held that the APJ did not abuse his discretion in holding *sua sponte* that those claims were unpatentable under § 103 based on the combination of the '645 patent and the Castagnos patent, or those two patents in view of the '235 patent, *see id.* at 28–29, and that a motivation to combine them arose from the nature of the problem to be solved (minimizing undesired cracking) and from the references themselves, *see id.* at 25–27. The Board also found that Gartside's evidence of unexpected re-sults in the form of the "second Johnson declaration" was unpersuasive, as that evidence did not pertain to the same process as that of the claims at issue. *See id.* at 35–36.

## DISCUSSION

### A. *Standards of Review*

#### 1. *Review of Factfinding by the Board of Patent Appeals and Interferences*

In *Dickinson v. Zurko,* 527 U.S. 150, 119 S.Ct. 1816, 144 L.Ed.2d 143, 50 USPQ2d 1930 (1999), the Supreme Court reversed our en banc decision that held that the appropriate standard of review of PTO findings of fact is the clearly erroneous standard, *see In re Zurko,* 142 F.3d 1447, 1449, 46 USPQ2d 1691, 1693 (Fed.Cir. 1998), and held that we must apply one of the standards set forth in the Administrative Procedure Act ("APA") at 5 U.S.C. § 706 (1994), *see Zurko,* 119 S.Ct. at 1818.

Section 706 reads in relevant part as follows:

§ 706. Scope of Review

The reviewing court shall—

.* * * * * *

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

* * * * * *

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an

---

5. 37 C.F.R. § 1.655(a) sets forth the Board's standard of review with respect to interlocutory orders entered by the APJ:

The Board may also consider whether entry of any interlocutory order was an abuse of discretion. All interlocutory orders shall be presumed to have been correct, and the burden of showing an abuse of discretion shall be on the party attacking the order. 37 C.F.R. § 1.655(a) (1999).

agency hearing provided by statute....

5 U.S.C. § 706(2)(A), (E) (1994). In *Zurko*, the Supreme Court did not determine whether the correct standard of review for PTO findings of fact is the "arbitrary, capricious" or the "substantial evidence" test. *See Zurko*, 527 U.S. 150, 119 S.Ct. at 1821, 144 L.Ed.2d 143, 50 USPQ2d at 1934. We feel compelled to decide that question, in order to secure the standard of review through which we will test the decision of the Board in this case.

■ The Supreme Court has indicated that the "arbitrary, capricious" standard of review is highly deferential. Under that standard, a reviewing court "must consider whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Because this standard is generally considered to be the most deferential of the APA standards of review, *see e.g.*, 6 Stein et al., *Administrative Law* § 51.03, at 51–117 (1999) ("The narrowest scope of judicial review of an agency['s] fact findings is afforded by the arbitrary, capricious, or abuse of discretion test."), the reviewing court analyzes only whether a rational connection exists between the agency's factfindings and its ultimate action, *see Hyundai Elecs. Indus. Co. v. ITC*, 899 F.2d 1204, 1209, 14 USPQ2d 1396, 1400 (Fed.Cir.1990) (noting that the "touchstone" of the "arbitrary, capricious" standard is rationality); see also 6 *Administrative Law* § 51.03, at 51–128.

■ On the other hand, the "substantial evidence" standard asks whether a reasonable fact finder could have arrived at the agency's decision, *see Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see generally* 3 Charles H. Koch, Jr., *Administrative Law*

*and Practice* § 10.3[1], at 22–26 (2d ed.1997), and is considered to be a less deferential review standard than "arbitrary, capricious." *See American Paper Inst., Inc. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 412–13 n. 7, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983) (characterizing the "arbitrary, capricious" standard as "more lenient" than the "substantial evidence" standard); *Abbott Lab. v. Gardner*, 387 U.S. 136, 143, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (characterizing "substantial evidence" review as "more generous judicial review" than "arbitrary, capricious" review). The Supreme Court has described "substantial evidence" in the following manner:

> Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.... Mere uncorroborated hearsay or rumor does not constitute substantial evidence.

*Consolidated*, 305 U.S. at 229–30, 59 S.Ct. 206 (citations omitted); see also *AK Steel Corp. v. United States*, 192 F.3d 1367, 1371 (Fed.Cir.1999) (quoting *Consolidated*). The Court has emphasized that "substantial evidence" review involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951). The Court has also stated, however, that "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *See Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966).

■ Moreover, courts have recognized that the "arbitrary, capricious" standard is one of default. *See Association of Data Processing Serv. Orgs., Inc. v. Board of Governors of Fed. Reserve Sys.*, 745 F.2d

677, 683 (D.C.Cir.1984) (the "arbitrary, capricious" standard "is a catch-all, picking up administrative misconduct not covered by the other more specific paragraphs."); *see also Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 n. 25 (10th Cir. 1994). In other words, the "arbitrary, capricious" standard applies when the "substantial evidence" test of section 706(2)(E) is deemed inapplicable. *See Aircraft Owners & Pilots Ass'n v. FAA*, 600 F.2d 965, 969 (D.C.Cir.1979). Thus, we return to the statute.

■ Section 706(2)(E) provides that "substantial evidence" review is afforded to agency factfinding performed during an adjudication in two circumstances: (1) factfinding performed in "a case subject to sections 556 and 557 of this title," and (2) factfinding performed in a case "reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). Factfinding by the Board does not fall within the first category, as § 554 excludes PTO adjudication from the trial-type procedures set forth in 5 U.S.C. §§ 556 and 557. Specifically, section § 554(a)(1) excludes agency adjudication from these requirements when the subject matter of that adjudication is subject to a subsequent trial *de novo, see* 5 U.S.C. § 554(a)(1) (1994),[6] as in the case of Board adjudication, *see* 35 U.S.C. § 145 (1994) ("Civil action to obtain a patent"); *id.* § 146 (1994) ("Civil action in case of interference"). Accordingly, these interrelated statutes dictate that Board factfinding does not fall within the first category of § 706(2)(E).

We next consider whether our review of Board factfindings made in the course of

its adjudicatory proceedings falls within the second category of § 706(2)(E), *i.e.*, "or otherwise reviewed on the record of an agency hearing provided by statute." 5 U.S.C. § 706(2)(E). Section 144 explicitly provides that we must review Board decisions "on the record" developed by the PTO, *see* 35 U.S.C. § 144 (1994) ("The United States Court of Appeals for the Federal Circuit shall *review* the decision from which an appeal is taken *on the record* before the Patent and Trademark Office.") (emphasis added), and it is for this reason that the Commissioner is required to convey the record to us in the event of an appeal, *see id.* § 143. Moreover, the "hearing" upon which the "record" is based is "provided by" 35 U.S.C. § 7(b), which states that:

> The Board of Patent Appeals and Interferences shall, on written appeal of an applicant, review adverse decisions of examiners upon applications for patents and shall determine priority and patentability of invention in interferences declared under section 135(a) of this title. Each appeal and interference shall be *heard* by at least three members of the Board of Patent Appeals and Interferences, who shall be designated by the Commissioner. Only the Board of Patent Appeals and Interferences has the authority to grant *rehearings.*

35 U.S.C. § 7(b) (1994) (emphasis added). Thus, the plain language of §§ 7 and 144 of Title 35 indicates that we review Board decisions "on the record of an agency hearing provided by statute," and that we should therefore review Board factfinding for "substantial evidence." *See also* Thomas Leonard Stoll, *A Clearly Erroneous Standard of Review,* 79 J. Pat. &

---

6. Section 554(a)(1) provides that:
 (a) This section applies, according to the provisions thereof, in every case of adjudication by statute to be determined on the record after opportunity for an agency hearing, *except* to the extent that there is involved—

(1) a matter subject to a subsequent trial of the law and the facts de novo in a court. . . .
5 U.S.C. § 554(a)(1) (1994) (emphasis added).

Trademark Off. Soc'y 100, 106 (1997) (arguing in favor of "substantial evidence" review based on 35 U.S.C. §§ 7(b) and 144).

In appeals from the Board, we have before us a comprehensive record that contains the arguments and evidence presented by the parties, including all of the relevant information upon which the Board relied in rendering its decision. *See* 35 U.S.C. § 143 (1994) ("[T]he Commissioner shall transmit to the United States Court of Appeals for the Federal Circuit a certified list of the documents comprising the record in the Patent and Trademark Office."). That record, when before us, is closed, in that the Board's decision must be justified within the four corners of that record. The record before us on appeal thus dictates the parameters of our review. We cannot look elsewhere to find justification for the Board's decision. Furthermore, the record reflects the results of a proceeding in the PTO during which the applicant has been afforded an opportunity to bring forth the facts thought necessary to support his or her position. Accompanying the record is a detailed opinion from the Board. We have expressly held that the Board's opinion must explicate its factual conclusions, enabling us to verify readily whether those conclusions are indeed supported by "substantial evidence" contained within the record. *See Gechter v. Davidson,* 116 F.3d 1454, 1460, 43 USPQ2d 1030, 1035 (Fed.Cir.1997) ("[W]e hold that the Board is required to set forth in its opinions specific findings of fact and conclusions of law adequate to form a basis for our review.").

In addition to the statutory language discussed above, Supreme Court precedent and the law of our sister circuits also indicate that "substantial evidence" review is appropriate in view of the plenary nature of the record before us. The Supreme Court has stated generally that the "basic requirement" for "substantial evidence" review is that the agency hearing produce a record that serves as the foundation for the agency's action. *See Overton Park,* 401 U.S. at 415, 91 S.Ct. 814; *Camp v. Pitts,* 411 U.S. 138, 141, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (noting that "substantial evidence" review "is appropriate when reviewing findings made on a hearing record"). In *Zurko* the Court echoed these prior decisions when it intimated that "substantial evidence" review is the appropriate standard for our review of Board factfinding. *See Zurko,* 119 S.Ct. at 1823 ("A reviewing court reviews an agency's reasoning to determine whether it is 'arbitrary' or 'capricious,' or, if bound up with a record-based factual conclusion, to determine whether it is supported by 'substantial evidence.' ").

*Chrysler Corp. v. DOT,* 472 F.2d 659 (6th Cir.1972), is instructive. In that case, the court had to determine whether the "arbitrary, capricious" or the "substantial evidence" test should be applied to automobile safety standards promulgated by the Secretary of Transportation. Those standards emerged from a statutorily mandated agency rulemaking hearing that was not "formal" in the sense of cases subject to sections 556 and 557 of the APA. The agency argued that the appropriate standard of review was the most deferential "arbitrary, capricious" standard, because the promulgated safety standards emerged not from formal adjudication, but from informal rulemaking. *See id.* at 667. To the contrary, the industry petitioners argued that the default standard should not apply, because the safety standards arose from hearings compelled by statute, and the scope of appellate review was confined to the record made before the agency in the informal rulemaking process. *See id.* The court concluded that the "substantial evidence" test of section 706(2)(E) should apply because the agency was required by law to compile a record that would restrict the scope of appellate review. *See id.* at

668. Consequently, only the evidence in the record could be used by the appellate court to justify or refute the agency action. In contrast, the court noted that when an agency decision is made on "the basis of data contained in its own files or on its own views or opinions ... a reviewing court cannot test the rules as promulgated against the evidence in the agency's record." *Id.* at 669. In those circumstances, the more deferential standard of review would be appropriate.[7]

The reasoning of the D.C. Circuit also supports our conclusion that "substantial evidence" review applies when the reviewing court must confine its review of agency factfinding to the record produced by the agency proceeding. In *Data Processing,* the D.C. Circuit considered the APA standards of review, and concluded that "[t]he distinctive function of paragraph (E)—what it achieves that paragraph (A) does not—is to require substantial evidence to be found *within the record of closed-record proceedings* to which it exclusively applies." *Data Processing,* 745 F.2d at 684 (emphasis added); *see also id.* at 683 ("The ['substantial evidence' test] is only a specific application of the ['arbitrary, capricious' test], separately recited in the APA ... to emphasize that in the case of [section 706(2)(E) ] proceedings the factual support must be found in the closed record as opposed to elsewhere.").

Because our review of the Board's decision is confined to the factual record compiled by the Board, we accordingly conclude that the "substantial evidence" standard is appropriate for our review of Board factfindings. *See* 5 U.S.C. § 706(2)(E).

### 2. *Other Applicable Standards of Review*

 Whether the Board possessed jurisdiction to continue the interference in order to decide the patentability of Gartside's claims is a question of law that we review de novo. *See James M. Ellett Constr. Co. v. United States,* 93 F.3d 1537, 1541 (Fed.Cir.1996) ("Jurisdiction is a question of law [that] ... we review *de novo.").* We review for an abuse of discretion the Board's decision to resolve issues of patentability that were not placed in issue by the parties during the interference. *See* 35 U.S.C. § 135(a) (providing that the Board *"may* determine questions of patentability" during the course of an interference) (emphasis added); 37 C.F.R. § 1.641(a) (1999);[8] *Perkins,* 886 F.2d at 328, 12 USPQ2d at 1311 ("The word 'may' in § 135(a) accommodates the situation when patentability is not placed at issue during the priority contest, but it would contradict the remedial purpose of the legislation if the Board could refuse to decide questions of patentability for which there had been adduced an appropriate record."). An abuse of discretion occurs when a decision is based on an erroneous

---

7. We recognize that a distinction has been drawn between formal and informal proceedings to determine which APA standard to apply, with the most deferential standard thought to be applicable in reviewing agency decisions made in informal settings. *See* 6 *Administrative Law* § 51.01[2], at 51–48. This distinction alone, however, cannot dispositively answer the standard of review question when an agency hearing is compelled by a law that also requires a closed record to be made of the proceeding, and Congress has limited the scope of appellate review to the record made of the agency's deliberations.

8. Section 1.641(a) provides that:

During the pendency of the interference, if the administrative patent judge becomes aware of a reason why a claim designated to correspond to a count may not be patentable, the administrative patent judge *may* enter an order notifying the parties of the reason and set a time within which each party may present its views, including any argument and any supporting evidence, and, in the case of the party whose claim may be unpatentable, any appropriate preliminary motions under §§ 1.633(c), (d) and (h).

37 C.F.R. § 1.641(a) (1999) (emphasis added).

interpretation of law or clearly erroneous factfinding, or if that "decision represents an unreasonable judgment in weighing relevant factors." *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1039, 22 USPQ2d 1321, 1333 (Fed.Cir. 1992) (en banc). In view of our holding that we review Board factfinding for substantial evidence, we will modify the second criterion accordingly.

■ Whether a claimed invention is unpatentable as obvious under § 103 is a question of law based on underlying findings of fact. *See In re Dembiczak,* 175 F.3d 994, 998, 50 USPQ2d 1614, 1616 (Fed. Cir.1999) (citing *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966)). The presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact. *See id.* at 1000, 50 USPQ2d at 1617. The Board's legal conclusion of obviousness is reviewed *de novo. See In re Rouffet,* 149 F.3d 1350, 1355, 47 USPQ2d 1453, 1455 (Fed.Cir.1998); *see also* 5 U.S.C. § 706 (1994) ("To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law...."). Although we have previously reviewed the Board's factual determinations in an obviousness analysis for clear error, *see Dembiczak,* 175 F.3d at 998, 50 USPQ2d at 1616; *Kemps,* 97 F.3d at 1429–30, 40 USPQ2d at 1311–12, we now review them for substantial evidence.

## B. *Jurisdiction*

■ Gartside argues that the Board erred in retaining jurisdiction over the interference proceeding, as no interfering subject matter remained after Forgac's withdrawal from the interference. Gartside thus contends that the interference should have been dissolved and that the patentability issues should have been decided by the examiner *ex parte.* Gartside

further asserts that the Board abused its discretion in addressing those issues, as the public interest relied on in *Perkins v. Kwon* was not here implicated, and the denial of remand to the examiner deprived him of certain procedural safeguards, *e.g.,* the right to amend, refile as a continuation application, and present evidence of unexpected results.

Citing *Guinn v. Kopf,* 96 F.3d 1419, 40 USPQ2d 1157 (Fed.Cir.1996), the Commissioner responds that Forgac's withdrawal did not divest the Board of jurisdiction to decide the patentability issues developed during the interference, and that under *Perkins,* the Board must decide all issues fairly raised and fully developed during the interference. The Commissioner further contends that the Board did not abuse its discretion in deciding the patentability of Gartside's claims because the public interest in *Perkins* was implicated and Gartside was denied no procedural safeguards, as Gartside's procedural options in the interference paralleled his options in *ex parte* examination.

Section 135(a) sets forth the Commissioner's authority to declare interference proceedings and the Board's jurisdiction to resolve issues relating to priority and patentability that arise during such proceedings. Section 135(a) provides in relevant part that:

(a) Whenever an application is made for a patent which, in the opinion of the Commissioner, would interfere with any pending application, or with any unexpired patent, an interference may be declared and the Commissioner shall give notice of such declaration to the applicants, or the applicant and patentee, as the case may be. The Board of Patent Appeals and Interferences *shall* determine questions of priority of the inventions and *may* determine questions of patentability.

35 U.S.C. § 135(a) (1994) (emphasis added). In *Perkins,* we held that under

§ 135(a), the Board *should* decide issues relating to priority and patentability that are fairly raised and fully developed during the interference, despite the permissive language of § 135(a) with respect to patentability issues. *See Perkins*, 886 F.2d at 328–29, 12 USPQ2d at 1310–11; see also *Schulze*, 136 F.3d at 792, 45 USPQ2d at 1774–75; *Wu v. Wang*, 129 F.3d 1237, 1242, 44 USPQ2d 1641, 1645 (Fed.Cir.1997). We noted that the permissive language addresses "the situation when patentability is not placed at issue during the priority contest, but it would contradict the remedial purpose of the legislation if the Board could refuse to decide questions of patentability for which there had been adduced an appropriate record." *See Perkins*, 886 F.2d at 328, 12 USPQ2d at 1311.

In *Guinn* we extended *Perkins*, holding that even when a party attempts to terminate the interference by disclaiming all of its claims relating to the count, the Board should decide priority when priority issues have been fairly raised and fully developed at the Board. *See Guinn*, 96 F.3d at 1421–22, 40 USPQ2d at 1159. In that case, Guinn attempted to terminate the interference by disclaiming his one claim that corresponded to the count, *see* 35 U.S.C. § 253 (1994), and moving to dismiss for lack of jurisdiction on the basis of a lack of controversy. *See Guinn*, 96 F.3d at 1420, 40 USPQ2d at 1158. Guinn argued that absent a priority dispute, the Board lacked jurisdiction to enter judgment against him in the interference pursuant to 37 C.F.R. § 1.662. *See id.* Rather than dismiss, however, the Board entered judgment against Guinn. *See id.*

Guinn appealed and we affirmed, holding that the disclaimer of all the claims corresponding to a count did not divest the Board of jurisdiction over the interference. *See id.* at 1421–22, 40 USPQ2d at 1159. We reasoned that once an interference has been properly declared, § 135(a) directs that the Board "shall determine questions of priority," and that under *Perkins*, the Board should resolve priority issues that have been fully developed before the Board. *See id.*

Based on *Perkins* and *Guinn*, we agree with the Commissioner that Forgac's withdrawal did not divest the Board of jurisdiction over the interference, and that the Board did not abuse its discretion in deciding the patentability of Gartside's claims. Even though *Guinn* involved a remaining issue of priority rather than patentability, we agree with the Commissioner that *Guinn* is sufficiently on point. In Forgac's notice to withdraw his request for a final hearing, Forgac authorized the APJ to cancel claims 1, 2, and 13 from the '058 patent, *see* Paper No. 63 at 2, the functional equivalent of Guinn disclaiming his claims corresponding to the count under § 253. Likewise, neither party here disputes that the interference was properly declared. While part of our reasoning in *Guinn* hinged on the fact that § 135(a) mandates that the Board "*shall* determine questions of priority," in *Perkins* we interpreted the language "*may* determine issues of patentability" as nearly mandatory when those issues have been fairly raised and fully developed before the Board. *See Perkins*, 886 F.2d at 328–29, 12 USPQ2d at 1310–11. Moreover, as with the priority issues in *Guinn*, the issues surrounding the patentability of Gartside's claims were fairly raised and fully developed during the proceeding.[9] Accordingly, we conclude that the Board properly resolved these issues under § 135(a).

9. Prior to Forgac's withdrawal, Forgac raised the issue of the patentability of all of Gartside's claims in a preliminary motion to the APJ, Gartside opposed that motion, and Forgac in turn replied to that opposition. *See* Papers No. 20, 29, and 36. Following the APJ's granting-in-part of Gartside's motion, Gartside further developed this issue in his request for reconsideration. *See* Papers No. 41 and 43. Moreover, the APJ independently raised and developed the issue of the patentability of claims 41, 45, and 46 in his *sua*

■ As we noted *supra,* the APJ raised the issue of the patentability of claims 41, 45, and 46 *sua sponte.* To the extent that the *sua sponte* holding meant that Forgac did not properly place the patentability of these claims at issue before the Board, we agree with the Commissioner that the Board acted within its discretion to decide the patentability of those claims based on the public interest as noted in *Perkins* and the fact that Gartside was in no way prejudiced by resolution of those issues by the Board rather than the examiner.

First, the public interest as discussed in *Perkins* is clearly served by the Board's resolution of the patentability issues surrounding Gartside's claims. The Board had already addressed the patentability issues with respect to claims 34, 35, 37–40, and 42–44, and the validity of claims 41, 45, and 46 turned on two of the same references used to invalidate those other claims. By deciding the patentability of claims 41, 45, and 46, the Board avoided yet another round of duplicative arguments before the examiner and achieved a timely resolution to the benefit of the parties and the public in general. As we stated in *Perkins:*

> The Board, by resolving both priority and patentability when these questions are fully presented, settles not only the rights between the parties but also rights of concern to the public. The public interest in the benefits of a patent system is best met by procedures that resolve administratively questions affecting patent validity that arise before the PTO. To do otherwise is contrary to the PTO's mission to grant presumptively valid patents, 35 U.S.C. § 282, and thus disserves the public interest.

*Perkins,* 886 F.2d at 328–29, 12 USPQ2d at 1311.

Moreover, we agree with the Commissioner that Gartside was not denied any procedural safeguards by the Board's refusal to remand to the examiner. Gartside was afforded the opportunity to redefine the interfering subject matter by amending his claims, *see* 37 C.F.R. § 1.633(c)(2) (1999), and he was free to file a continuation application, *see* 37 C.F.R. § 1.633(d) (1999); *see also* 35 U.S.C. § 120 (1994). Moreover, 37 C.F.R. § 1.639 permits a party to introduce evidence in support of motions, oppositions, and replies, and 37 C.F.R. § 1.640(e)(3) also enables a party to introduce evidence in response to an order to show cause. Although Gartside alleges that he was prejudiced for want of other assorted procedural safeguards, these allegations are similarly without merit.

In sum, we conclude that the Board did not err in retaining jurisdiction over the interference to decide the patentability of Gartside's claims.

## C. The Patentability of Claims 34, 35, 37–40, 42–44 and 47

■ Gartside argues that the Board erred in holding claims 34, 35, 37–40, 42–44, and 47 unpatentable under § 103, because the references do not teach or suggest the claimed invention. Gartside principally contends that the '645 and '235 patents are directed to *thermal* cracking processes, and that there was no suggestion in the art to employ a quench step in *catalytic* cracking processes. Gartside further asserts that the '235 patent teaches away from employing a quench in catalytic cracking. The Commissioner responds that the claims would have been obvious over Gartside's '645 and '235 patents, as those references contain each and every element of the claimed processes. The Commissioner argues that one of ordinary

*sponte* holding of unpatentability, to which Gartside also responded. *See* Papers No. 41 and 47. Even after Forgac's withdrawal, Gartside was provided with additional opportunities to develop the patentability issues before the Board. *See* Gartside's BPAI Br. at 4–24, 27–30.

skill in the art would have been motivated to combine the '645 and '235 patents, as they both attempt to solve the same problem, *viz.*, continued thermal cracking of the cracked product. The Commissioner also contends that the '235 patent does not teach away from employing a quench in catalytic cracking.

▮ A claimed invention is unpatentable as obvious "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a) (1994); *see Dembiczak*, 175 F.3d at 998, 50 USPQ2d at 1616. "The ultimate determination ... whether an invention is or is not obvious is a legal conclusion based on underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the prior art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of nonobviousness." *Dembiczak*, 175 F.3d at 998, 50 USPQ2d at 1616 (citing *Graham*, 383 U.S. at 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 USPQ at 467). We have further indicated "that the best defense against the subtle but powerful attraction of a hindsight-based obviousness analysis is rigorous application of the requirement for a showing of the teaching or motivation to combine prior art references." *Id.* at 999, 50 USPQ2d at 1617. That suggestion may come from, *inter alia*, the teachings of the references themselves and, in some cases, from the nature of the problem to be solved. *See Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573, 37 USPQ2d 1626, 1630 (Fed.Cir.1996); *Rouffet*, 149 F.3d at 1355, 47 USPQ2d at 1456.

We agree with the Commissioner that substantial evidence supports the Board's factfinding and that the Board correctly concluded that the claims were unpatentable under § 103. As an initial matter, we agree with the Commissioner that substantial evidence supports the Board's finding that Gartside's '645 and '235 patents contain all the limitations set forth in claim 47. *See Gartside*, Paper No. 72 at 12–13. The Board found that all the limitations of claim 47 are found in the '645 patent, except that the '645 patent accomplishes cracking by a thermal rather than a catalytic mechanism. *See Gartside*, Paper No. 72 at 13. This finding is clearly supported by the following disclosure in the '645 patent:

> [T]he reaction proceeds at 1500 F for a residence time of about 0.05 to 0.40 seconds, preferably form [sic] 0.20 to 0.30. The product gases are separated from the solids in separator 8 ... and the product gases pass overhead through a line 22 and are immediately quenched with typical quench oil that is delivered to line 22 through line 36. The quenched product is passed through a cyclone 24 where entrained solids are removed....

'645 patent, col. 2, l. 62 to col. 3, l. 2. The Board found the missing limitation in the '235 patent, which teaches that the claimed apparatus may be used in catalytic cracking processes involving quenching and separation steps as in claim 47. *See Gartside*, Paper No. 72 at 13 (citing '235 patent, col. 4, ll. 42–47). Based on the foregoing, we conclude that the Board's finding that all of the limitations of the claimed invention are found in Gartside's '645 and '235 patents is supported by substantial evidence.

Gartside further contends that the Board erred in finding that sufficient motivation existed to combine the '645 and '235 patents to arrive at the invention in claim 47. *See id.* at 14. We disagree. As the Board indicates, the '645 patent addresses the problem of hot particulate solids con-

tinuing to crack the product after the desired thermal cracking reaction has been completed, solving that problem by applying a quench after primary separation of cracking particles from the product. *See* Paper No. 72 at 14–15. The Board further found that the '235 patent suggests that the presence of either hot thermal *or* hot catalytic solids in the product stream may cause undesired cracking. *See id.* at 15 (citing '235 patent, col. 1, ll. 6–10). These disclosures provide substantial evidence supporting the Board's finding that one of ordinary skill in the art would have been motivated also to apply the teachings of the '645 patent relating to arresting undesired cracking in thermal processes to minimize undesired cracking in catalytic cracking processes.

Gartside also asserts that the '235 patent teaches away from applying the process disclosed in the '645 patent to catalytic reactions. This contention is without merit. Gartside cites the following language from the '235 patent:

> In some reaction systems, specifically catalytic reactions at low or moderate temperatures, quench of the product gas is undesirable · from a process standpoint. In other cases, the quench is ineffective in terminating the reaction. Thus, these reaction systems require immediate separation of the phases to remove catalyst from the gas · phases. Once the catalyst is removed, the mechanism for reaction is no longer present.

'235 patent, col. 1, ll. 49–56. As the Board found, however, this portion of the specification addresses the undesirability of a quench used in catalytic reactions at *low to moderate* temperatures, not the high temperature reactions at issue in the '645 patent, and teaches that in other undefined systems, quenching is ineffective. *See Gartside*, Paper No. 72 at 16. That is not a clear "teaching away" from use of a quench in all catalytic systems. Accordingly, substantial evidence supports the

Board's finding that this disclosure does not teach away from the claimed invention. *See id.* at 16–17.

Having concluded that the Board's factual findings relating to its § 103 analysis are supported by substantial evidence, we further conclude that the Board did not err as a matter of law that claims 34, 35, 37–40, 42–44 and 47 are invalid as obvious. We have carefully considered Gartside's additional arguments but find them unpersuasive.

### D. *Patentability of Claims 41, 45 and 46*

· ▮ Gartside argues that the Board erred in its *sua sponte* holding that claims 41, 45, and 46 are unpatentable under § 103 based on the '645 patent in view of the Castagnos patent, or on those two patents in view of the '235 patent. Gartside contends that the Board erred in combining those patents, because there was no teaching or suggestion to use a 0.1 to 0.6 second kinetic residence time in a catalytic cracking process. Gartside further argues that his showing of unexpected results, as described in the second Johnson Declaration, constitutes a secondary consideration weighing in favor of nonobviousness, and that the Board erred in discounting those results. The Commissioner responds that the Board correctly held that the claims were unpatentable, arguing that the motivation to combine the references arose from the references themselves, as well as the nature of the problem to be solved, *viz.,* maximizing reaction conditions in cracking processes by minimizing residence time. The Commissioner further contends that Gartside's evidence of unexpected results is not probative of nonobviousness, as the examples disclosed in the second Johnson Declaration do not correspond to any process within the scope of the claims at issue.

We agree with the Commissioner that substantial evidence supports the Board's

finding that a motivation to combine the '645, '235, and Castagnos patents arose from the teachings of the references themselves and the nature of the problem to be solved.[10] As the Board found, use of low residence times to arrest undesired cracking in the '645 and '235 patents was part of a "trend in the art towards short residence times." *Gartside*, Paper No. 72 at 27; see '645 patent, col. 1, ll. 61–67 (disclosing residence times of between 0.05 to 0.4 seconds); '235 patent, title ("LOW RESIDENCE TIME SOLID–GAS SEPARATION DEVICE AND SYSTEM") and col. 7, ll. 26–31 (disclosing that adjustment of the claimed apparatus may yield residence times of 0.1 and 0.5 seconds). In view of this trend, one of ordinary skill who was attempting to minimize undesired cracking reactions would have been directed by these two patents to the Castagnos patent, which describes low residence time catalytic reactions and which discloses the precise residence time in the disputed claims. *See* Castagnos patent, col. 2, ll. 6–12 (disclosing residence times of "about 0.1 to about 1 second"). Accordingly, we conclude that substantial evidence supports the Board's finding that a motivation existed to combine these patents to obtain the invention claimed in claims 41, 45, and 46.

Gartside also argues that the Board erred in finding that the second Johnson declaration, which allegedly contains evidence of unexpected results,[11] did not weigh in favor of the patentability of claims 41, 45, and 46. We disagree. The

Board essentially adopted the APJ's order to show cause as it pertained to the second Johnson declaration, finding that the process recited in the declaration failed to reproduce the separation and quenching steps of the claimed process. *See Gartside*, Paper No. 72 at 35–36. This finding is supported by the declarant's own statements, which reveal that the quench in the declaration experiment *preceded* the separation of product from catalyst. *See* Paper No. 48 at 3, ¶ 9. Accordingly, we agree with the Commissioner that substantial evidence supports the Board's finding that the examples in the declaration do not correspond to any process within the scope of the claims, and the declaration is therefore not probative of nonobviousness. *See Gartside*, Paper No. 72 at 35–36.

In summary, we conclude that all of the Board's disputed factfindings are supported by substantial evidence and that the Board did not err as a matter of law in holding that claims 41, 45, and 46 are invalid under § 103.[12]

## CONCLUSION

The Board did not err in maintaining jurisdiction over the interference proceeding despite the withdrawal of the junior party, and further did not err in deciding the patentability of Gartside's claims that corresponded to the count. To the extent that the Board's decision to resolve the patentability issues surrounding claims 41, 45, and 46 under § 135(a) was discretion-

10. The Board did not perform a separate "motivation to combine" analysis, but incorporated the reasoning from its conclusion that claims 41, 45, and 46 were not patentably distinct from Gartside's other claims that corresponded to the count. *See Gartside*, Paper No. 72 at 25–29.

11. According to the second Johnson declaration, these unexpected results include a 5% increase in gasoline yield and considerably less undesired dry gas and liquefied petroleum. *See* Paper No. 48 at 8, ¶¶ 19–21.

12. We will only briefly note Gartside's contention that the Board erred in even addressing the patentability of these claims. We agree with the Commissioner that the Board properly upheld the APJ's denial of Gartside's motion to redesignate these claims as not corresponding to the count. *See Gartside*, Paper No. 72 at 28. In short, we agree with the Board that these claims are not patentably distinct from the other claims corresponding to the count for the same reasons that these claims are unpatentable under § 103.

ary, the Board did not abuse its discretion. As for the patentability of claims 34, 35, and 37–47, all of the Board's disputed factual findings relating to its obviousness analysis are supported by substantial evidence, and we find no error in the Board's conclusion that the claims are unpatentable as obvious as a matter of law.

Accordingly, we

*AFFIRM.*