**In re Misha TERESCHOUK.**

**No. 01–1112.**

United States Court of Appeals, Federal Circuit.

April 4, 2001.

Rehearing and Rehearing en banc Denied June 1, 2001.

Before BRYSON, GAJARSA, and LINN, Circuit Judges.

DECISION

PER CURIAM.

Misha Tereschouk appeals the decision of the United States Patent and Trademark Office's Board of Patent Appeals and Interferences (the "Board") sustaining a final rejection of all of the claims of Mr. Tereschouk's patent application No. 08/490,903. We *affirm.*

## BACKGROUND

Mr. Tereschouk's application claims methods for automatically distributing drugs to the holder of a pre-encoded portable medical data carrier. The claims recite methods in which a doctor encodes a patient's prescription onto an updatable portable medical data carrier, such as a credit-card sized integrated circuit card. The data carrier includes identification data, prescription data, and financial data. During the encoding process, the prescription is safety-checked for items such as contraindications, maximum approved dosages, and adverse drug interactions.

After the safety check the data carrier is given to the patient. The patient may then present the data carrier to a drug-dispensing machine. The drug-dispensing machine verifies the patient's identification by means similar to the manner in which a bank ATM card might be validated, such as a memorized code or the patient's physical features (fingerprint, voice, etc.). After identity verification, an optional safety check may be performed similar to the check performed when the prescription was encoded. The drug-dispensing machine then delivers the prescribed drugs to the patient. The data carrier is re-encoded to reflect the dispensing transaction and then is returned to the patient.

The Board sustained five of the Examiner's six rejections, which together encompass all of the submitted claims. Each of the sustained rejections was for obviousness, based on various combinations of U.S. Patent Nos. 5,528,021 ("Lassus"), 4,953,745 ("Rowlett"), 4,847,764 ("Halvorson"), and 5,337,919 ("Spaulding"). The five sustained rejections were:

2. Claims 1–5, 17, 18 and 20–22 based on the combination of Lassus and Rowlett.

3. Claims 6–16 based on the combination of Lassus, Rowlett, and Halvorson.

4. Claims 1–5 and 17–22 based on the combination of Lassus and Spaulding.

5. Claims 6–16 based on the combination of Lassus, Spaulding, and Halvorson.

6. Claims 23–29 based on the combination of Lassus and Halvorson.

Because Mr. Tereschouk took the position that all the claims stood or fell together, the Board only considered representative claim 1 for rejections 2 and 4, representative claim 6 for rejections 3 and 5, and representative claim 23 for rejection 6. The representative claims recite:

1. A method of automatically dispensing of drugs directly to a holder of an updatable portable medical data carrier by a drug dispensing machine that is not preset for medicinal needs of any particular holder, said machine containing a plurality of drugs which are not prescribed to any particular holder, said machine automatically performing the steps of:

a) reading a preencoded portable medical data carrier after said carrier is presented by said carrier's holder to said machine;

b) verifying said holder's identity;

c) delivering directly to said holder only drugs representing medicinal needs of said holder from a plurality of drugs stored in said machine; and

d) reencoding said carrier to include said dispensing machine.

6. The method of claim 1 wherein said delivering includes automatically checking safety of said drugs being delivered: if said drugs are safe to said holder, said dispensing proceeds further; if not, said dispensing is stopped.

23. A method of automatically encoding a prescription onto a memory

means by an encoder automatically performing the steps of:

a) verifying identity of medical professional making a prescription to a holder of a portable medical data carrier;

b) reading said carrier after said carrier is presented to said encoder by said medical professional;

c) checking safety for said holder of said prescription after said prescription is entered into said encoder by said medical professional; and

d) encoding said safe prescription onto a memory means.

The Board made findings as to what each of the cited prior art references teaches. The primary reference for each of the rejections, Lassus, describes a system in which a doctor encodes a prescription onto a patient's chip card, which also includes encoded information about the patient's name, address, and insurance coverage. The patient takes the card to a pharmacist who places the card into a reader that displays the electronic prescription. The pharmacist then fills the prescription and the reader re-encodes the chip card to erase the prescription, thus preventing the patient from filling the same prescription multiple times.

Rowlett discloses a drug-dispensing device into which the operator (usually a nurse) inserts the operator's identification card and a patient card. The operator then uses a keyboard to select a drug to be dispensed for the patient. The dispensing device determines whether the requested drug is one of the drugs to which the patient is allergic. If the drug is not on the patient's allergy list, the drug is dispensed to the nurse.

Spaulding discloses a drug-dispensing system as well. Spaulding's system compares prescription information stored in a host computer against a database that lists the drugs available to the dispensing system. If a match is found against the database, the system dispenses the prescribed medicine into a vial.

Halvorson discloses a system in which the doctor enters prescriptions into a database. During the entering process, the system performs automatic safety checking that warns against drug interactions, allergic reactions and medication duplication. At each nurses' station, drug dispensing stations periodically monitor the prescription database to determine if medication should be given to a particular patient. If so, the need for medication is printed on a report at the nurses' station.

## DISCUSSION

■ Obviousness under 35 U.S.C. § 103 is a legal question based on underlying findings of fact. *See In re Dembiczak*, 175 F.3d 994, 998, 50 USPQ2d 1614, 1616 (Fed.Cir.1999). We review the legal conclusion of obviousness *de novo, see id.*, but we must uphold decisions of the Board on factual matters if there is substantial evidence in the record to support the Board's findings, *see Dickinson v. Zurko*, 527 U.S. 150, 165, 119 S.Ct. 1816, 144 L.Ed.2d 143, 50 USPQ2d 1930, 1937 (1999); *In re Gartside*, 203 F.3d 1305, 1315, 53 USPQ2d 1769, 1775 (Fed.Cir.2000).

■ Most of Mr. Tereschouk's arguments on appeal boil down to one proposition: that in the prior art systems supervision necessarily occurs at the drug-dispensing stage–usually by a pharmacist. The elimination of such supervision, according to Mr. Tereschouk, provides the requisite distinction to overcome an obviousness rejection. Thus, Mr. Tereschouk contends that the prior art teaches away from the elimination of human supervision. Even if that characterization of the prior art were true, however, the Board correctly concluded that the purported

elimination of supervision is not a patentable distinction from the prior art.

To support his case, Mr. Tereschouk maintains that the elimination of a pharmacist would have three new and unexpected effects: dispensing accuracy approximating a zero-error level, homogeneity of dispensing results, and privacy in purchasing drugs. What the prior art does or does not recognize is a question of fact, *see Para–Ordnance Mfg., Inc. v. SGS Importers Int'l, Inc.,* 73 F.3d 1085, 1088, 37 USPQ2d 1237, 1239 (Fed.Cir.1995), and substantial evidence supports the Board's findings that these effects were neither new nor unexpected.

The first and second of Mr. Tereschouk's claimed unexpected results, accuracy and homogeneity, relate to the same feature: accuracy in the retrieval, counting, and weighing of medications. Substantial evidence supports the Board's finding that the prior art had already recognized that automation of the dispensing function could increase accuracy in these ways. Mr. Tereschouk submitted an article describing the RxOBOT system that had already been used in hospital pharmacies to dispense more than 40 million medications, with no reported errors. As the Board noted, several of the references recognize that automation reduces human errors. *See* Spaulding, col. 2, II. 42; Rowlett, col. 1, line 55, through col. 2, line 9; Halvorson, col. 1, II. 39–44. Furthermore, it is the automation of the dispensing function that creates the beneficial results. Automation does not depend on whether a pharmacist or a patient is operating the dispensing machine.

Substantial evidence also supports the Board's finding that Mr. Tereschouk's purported privacy advantage is illusory. As the Board stated, privacy is illusory because Mr. Tereschouk's system makes records of each transaction and those records are available for review purposes. Mr. Tereschouk does not dispute that finding, but focuses instead on a separate aspect of privacy: that the patient need not have face-to-face contact with a dispensing pharmacist. Even if that were an important advantage, the prior art (as demonstrated by articles submitted by Mr. Tereschouk) already provides for this advantage through mail-order pharmacies.

In the United States, it is generally unlawful for prescription drugs to be dispensed without the participation of a medical professional or pharmacist. While legal requirements as to who may dispense prescription drugs do not control whether the present invention is patentable or not, the fact that the prior art recognizes the legal requirement for a licensed professional to participate in drug dispensing does not mean that the elimination of the pharmacist's participation constitutes a patentable novelty.

Finally, as the Board correctly noted, claim 23 does not require either the presence or absence of a pharmacist. Claim 23 describes the method of encoding data on the portable data carrier–not any events that occur when the encoded card is later used to obtain the prescribed drugs. On appeal, Mr. Tereschouk states that the patentable distinction in his system is the safety checking as a necessary condition of encoding the prescription on a portable data carrier. As stated above, however, the Board found that Lassus discloses the process by which an authorized person encodes information on a portable data carrier and that Halvorson discloses the automatic checking of a patient's medication order as a prescribing physician is entering it into a computer. Substantial evidence supports both of these findings. Lassus discusses authenticating the medical professional's identity as well as encoding the prescription. *See* Lassus, col. 2,

II. 50–55; col. 5, II. 7–13. Halvorson "provides for the automatic checking of a patient's medication order as it is being entered ... to warn" of problems such as duplication and drugs that should not be administered together. *See* Halvorson, col. 4, II. 47–53. Based on those findings, the Board properly concluded that claim 23 was unpatentable for obviousness under 35 U.S.C. § 103.